May it please the Court? Would you speak a little louder, please, Ms. Wong? Oh, I'm sorry. Can you hear me now? That's mostly a recording device, so we need to be able to hear you, too. It's not helping me any. Keep it down where you can. I have not heard a word you said. I'm so sorry. Can you hear me now? That's helpful. Thank you, Your Honors. Good morning. My name is Priscilla Wong. I represent the petitioner, King On Wong, who applied for political asylum and whose case was denied on the basis that he was mandatorily barred on the grounds of 8 CFR 208.15, which requires mandatory denial of an asylum application because of firm resettlement. And the issue is whether or not the alien has firmly resettled in another country. All right, let's get to the heart of the matter. He comes from China to Hong Kong. He's in Hong Kong for, what, 12, 13 years? Something like that, yes. Something like that. He gets a driver's license, an identity card, and he's part of the Hong Kong community. Yes. Why doesn't that constitute resettlement? It's a question of the intent of firm resettlement. When the statute says that he entered another country and received benefits of permanent resettlement, we contend that the other country, which is Hong Kong, has now become the country from which he fled, which was China. Let me ask you a question about that. What's happened with Hong Kong under this one country, two systems approach that Communist China has taken is it is no longer a British colony. The sovereignty is now in Communist China. However, they still have, although the Communists may be diluting it, a separate system. I don't see why sovereignty should necessarily defeat firm resettlement. The analogy that I'm thinking of is Guantanamo Bay. The sovereignty of Guantanamo Bay is in Cuba. Cuba is the sovereign of that real estate. However, nobody in his right mind would think that some Cuban poet, say, who's been persecuted by the Castro regime, had a well-founded fear if he was in Guantanamo Bay. I'm not familiar with the Guantanamo Bay situation. It's land where the sovereignty is in Cuba, but the control is in the United States. So even though it's part of Cuban sovereign territory, it isn't controlled by Cuba. And I'm asking if Hong Kong isn't similar. Well, that would be the difference. The control in Hong Kong actually resides with the Beijing government. And that is spelled out in the basic law, which says that the government in mainland China can interpret or redefine any decisions made either in the court of final appeals or any other decisions made by the Hong Kong government, which is in fact... Is there any reason, anything in the record, to suggest that people who were in Hong Kong now? There's nothing in the record, Your Honor. But if we're relying on the transcript... This fellow's father was struggled against, right? Yes. I would like to point out that the transcript is about 90-some-odd pages long. And of that, about 10 pages relates to the asylum claim. The immigration judge, in rendering her decision, said that there are certain allegations that he's made but never explained. And I think that the record below is really incomplete because of this mandatory bar. Anything for you? We need to focus on the period between 1984 and 1997. Because in 1984, it became like, it became known to the people of Hong Kong that they were going back to China in a few years, by 1997. The lease was going to expire. And the question has come up in this case, because there are no cases that I could find in the United States, no published cases. There's some unpublished stuff. But there are no published cases about people being firmly resettled. What is your support for the claim that he was not firmly resettled? He was traveling all over the world with a Hong Kong passport. He was going back and forth to the United States like a traveling salesman. So he didn't have any problem getting in and out of Hong Kong during that period. Was he resettled then? If we are defining firm resettlement according to the indications or examples in the regulations, it's possible to say that he is firmly resettled, except for the fact that the government from which he fled has become the case. If we write an opinion saying he was or was not resettled, it may have unintended consequences for a lot of people in the future. Can you help us define what should be the standards, what should be the guideline for taking care of this problem that arises from those who spent a lot of time in Hong Kong in a perfectly friendly atmosphere in 1984, 85, 86, and so on? And then as the time gets closer to China taking over, some farsighted people, like those who left Germany in 1935 instead of waiting until 1939, they got out and the others didn't. Now, what are we going to say about people who decided to come to the United States before 1997 but after 1984? I think we need to look at the humanitarian intent of the asylum law, which is to provide a the ultimate question is, is it safe to return someone to a government that he originally fled? This case is complicated a little bit by some other changes. He's not the same person whose daddy was being hounded by the neighborhood busybodies during the Cultural Revolution, and China is not the same country. I mean, China is becoming a kind of a crypto-capitalist country now. They've got all kinds of, they're one of the leading trading nations in the world with a big economy that's safe. This isn't the China we knew in 1947. That's very true, your honor. China right now is embracing capitalism with a lot of enthusiasm. However, it has not embraced the rule of law, or it has not embraced the principle of elected officials. There are no direct elections in China. There is only one political party running for office, so in many ways... Is there any evidence that the Chinese government or the aparatchiks, the bureaucratic people at the lower level, are persecuting returning natives who have been sojourning outside the country? Persecuted? Not solely on the basis that they left the country, no. What is the evidence in this record that this petitioner would suffer persecution upon return to the mainland, or even to Hong Kong for that matter? There is probably, from the record, there is nothing. But as I said, the record is very scant on the issue of asylum, primarily because the judge was more intent on the mandatory bar than on the merits of the asylum claim. We're only talking about the potential for harm. In 1984, what was the understanding with respect to China's taking back this area, whether it's the New Territories or Kowloon, whatever? What do we know about what was already planned to occur that was known generally? I think the plans for takeover began with mutual consultation between China and Great Britain as far back as the mid-80s. And at that time, there was consultation back and forth as to what type of government would be installed in Hong Kong, how much autonomy the territory would be given. But none of this was actually effectuated until 1997, and the preparations were very gradual. In 1984, I don't think that there was even any contemplation of the provisions in the basic law, which is the constitution of Hong Kong. I'm trying to put together something in my mind, and I'm having difficulty with it. Maybe you can help me. I'm thinking, there really isn't any question that this fellow was firmly resettled in Hong Kong. And if the government of Hong Kong had not changed, you'd have no case at all. I'm not asking you to argue that. Yes, I would agree. Now, regime change is not that uncommon. Judge Goodwin brought up the regime change in Germany when the Nazis took over. There are regime changes all the time in the Middle East. Regime changes happen. So what your case is, is that the doctrine of firm resettlement should not be applied to a country where there has subsequently been, subsequent to the firm resettlement, a regime change. And what I'm thinking is, well, that really doesn't make any unless the regime change is material to the goals of asylum policy, giving people a refuge from persecution for one of the listed reasons. Here, the regime change would be highly material if Wong were, say, a fallen Gong Christian. But I don't see where it's material to someone whose father was struggled against in the Cultural Revolution. I would agree with you, except that I would like to emphasize once again that the transcript below is really not adequate. We have to deal with that transcript. It's Wong's burden and we have to use the record we've got. Which is, I guess, the reason why we've asked for a remand so that the record could be... Counsel, why don't you reserve the rest of your time and we'll hear from the government, then we can hear back from you, unless there's anything else you need specifically to tell us now. No. Okay, thank you. May it please the Court, John Yunshai again on behalf of the United States Attorney General. Your Honors, the only issue in this case is whether Mr. Wong, a Chinese national, was firmly resettled in Hong Kong prior to his arrival in the United States and thus not eligible for asylum. He did firmly resettle in Hong Kong prior to his arrival. Petitioner agrees with that and therefore the Board of Immigration Appeals properly found him to be ineligible for asylum. The matters that were brought up by opposing counsel as to the intent of firm resettlement, I think, are very clear and plainly articulated in the statute and in the regulations. Those two branches of government decided specifically to present a statute and regulation that found most important the period of time prior to the applicant's admission or arrival in the United States. Counsel, can you help me on this problem that I posed? What if someone is firmly resettled but then the country that he's firmly resettled in has a regime change? What happens to his firm resettlement, particularly where the regime change is that the country is taken over by the country that he fled from? In that situation, there is recourse for those people and there was recourse for Mr. Wong and he actually pursued that recourse before the immigration judge and that is asylum is a discretionary matter. It's a matter of domestic law that is under the discretion of the Attorney General. What is not discretionary is withholding of deportation in this case or withholding of removal to a country where somebody's life or freedom would be at risk of persecution if you were more likely than not to be persecuted on account of a protected ground. That is the recourse so that should allay the concerns of the court in that situation, that scenario. In that situation, we'll use Hong Kong as an example. If this person is firmly resettled, he comes to this country, China takes over and if there is evidence that that petitioner presents that shows individual risk of persecution to him or her, he can apply for withholding of deportation. I can't remember for sure whether the record establishes persecution of Falun Gong in Hong Kong. Let's say it does or let's say that things we can take notice of do and suppose he were Falun Gong, what would his recourse be? His recourse again would be to apply for withholding of deportation in this case. I'm not exactly sure if the record contains any indice of persecution of Falun Gong in Hong Kong but he would be able to present that claim to the immigration judge. The immigration judge would find whether or not that individual qualifies for such relief and therefore his remedy would be withholding of his removal to Hong Kong until the conditions may in the future. That recourse was available to the petitioner in this case. That should allay the court's concerns as to whether or not we're sending people back into these really peculiar scenarios. Any peculiar scenario which we sort of have here, yes, the country is now under the administration or Hong Kong is under the administration of China and it wasn't before. What's the government's position in that kind of situation? This is unique. But on one hand, it was known perhaps as early as the early 80s, not just the middle 80s, that reversion was going to occur and probably by 1997. On the other hand, what difference should that make in terms of resettlement? What's the government's position on all of this? Well, I think, your honor, you have to look to the intent of Congress in establishing the scenario. That scenario was known in 84, the agreement, I think it was between Hong Kong, or rather China and England, set up this scenario. But Congress, I think, and the government's position would be that these people do have recourse in that situation. Congress still specifically promulgated this statute that firm resettlement will bar asylum prior to, if they're firmly resettled, prior to the entry in this country. And whether or not there is some sort of other form of remedy to protect these individuals from returning to that particular scenario, I think that it exists in the regulations and statute that we have. What would be available to this petitioner here? Well, what would be available was what he sought in the beginning before the immigration judge, and that is withholding of deportation. And for whatever reason, petitioner did not choose to appeal the decision of the immigration judge, finding that that person didn't have a well-founded fear of future persecution in Hong Kong or China, I should say. And that was not appealed to the immigration appeals. Was that determination made on the merits of the risk of persecution? Yes, Your Honor. It was made on the evidence before the court. There was testimony taken about, obviously, his prior treatment. And I think it's also important to note that the record indicates that this person, after he has moved to Hong Kong and settled there for quite some time, went back to China and worked there, I think for a period of three years, from 1989 to 1992. And the only statement that we have from the petitioner as to any mistreatment was he testified to kind of getting caught up in some sort of corruption scandal at work that he wanted no part of. It was a private entity that worked in conjunction with the government. And that's all we have. He was not persecuted on any other ground. The immigration judge didn't find that he ruled that there was no likelihood, or more likely than not, a scenario of him suffering persecution. And it's also important to point out, I think, that at the end of his testimony, he was asked by, I believe it was a different attorney at that period in time, he was asked, do you fear being harmed if you were returned on account of, and the attorney went through the protected grounds, race, religion, nationality. And he said, no, I don't want to leave my wife. And I've started a new life here, essentially, in the United States. So it's a very clear cut. Again, I think the statute's very clear. Any concerns about returning someone to a dubious situation in the future, I think, are allayed by the withholding of removal remedy that's available. And the language in the statute and regulation are very clear. We're only concerned about resettlement prior to his arrival in this country. Petitioner concedes that he was permanently resettled prior to, therefore, he's barred from asylum. Now, does the government have a policy with respect to what the status of Hong Kong is? In terms of resettlement, the resettlement rule that you administer, is Hong Kong a separate country from China? Well, Your Honor, I don't know what the government's official position would be on that. All I can say is that, as far as my research has indicated, any resettlement in Hong Kong, Hong Kong has been considered to be a country, I guess, for firm resettlement purposes. But it doesn't exist anymore. Well, it does under the purview, obviously, of China. And it existed essentially in the same way that it did before. It was under the administration as a British protectorate, I guess, of a colony. And now, rather, it's under China. And going back, I guess, I looked this up myself in Black's Law Dictionary as to what a country is, really. There's a source for it. Yeah, well, Black's, for whatever it's worth, says that a country is a nation, a political state, or the territory of such a nation or state. It's too abstract for it to be useful to me. I'm thinking sovereignty doesn't fully answer the question, as I was discussing with your colleague in the Guantanamo Bay situation. But it really does matter if there's a change. The hypothetical case I'm thinking of is, suppose somebody opposed Saddam Hussein, and they were an Iraqi dissident. And what they did, so that they wouldn't get put through a meat grinder, is they went to Kuwait, got asylum, and they firmly resettled in Kuwait. I don't know if this would be possible as a hypothetical case. And then Saddam Hussein conquered Kuwait and was starting to put dissidents he found there through his meat grinders. Would it be the government's position that the firm resettlement in Kuwait, prior to the Iraqi conquest of Kuwait, eliminated the possibility of granting asylum in the United States under the firm resettlement doctrine? Excuse me. I think, specifically in that scenario, there's protection all the way around, I think, in any scenario. If this individual, and I mentioned the withholding of deportation availability, that's available to someone that's in proceedings, as Mr. Wong was. Let's say proceedings are now over, all is said and done, country conditions change in Kuwait, and now this person is at risk of being deported there. He can file a motion to reopen based on changed country conditions in Kuwait. If you send me back to Kuwait, I will be persecuted, and therefore, after the board grants his motion to reopen and has submitted proper evidence, can file that motion to reopen if it's granted. We have a new asylum case before the board of the immigration judge. So there is recourse in the situation where someone is in proceedings, there's recourse after the conclusion of proceedings and there's a final order. They can still move to reopen their case. So there is protection for those people in either of those scenarios. And if there are no further questions, again, I would just restate, Your Honor, the situation is very clear. The plain language of the statute, I think, controls. He was firmly resettled prior to his arrival in the United States, and therefore, it was mandatorily barred from being held. Before you leave, I'm still trying to focus on the option to petition for withholding. But looking at it from the standpoint of whether that rule was properly applied in this case, regardless of anything else that went on, is it fair to apply the resettlement rule to a country which or an entity which will revert to another country which is a possible persecutor of this individual? I would say yes, Your Honor. It is fair because that manner of application is clearly provided for by the statute. The statute is silent on it. This is a highly unusual situation. Yes, Your Honor. But again, I would say it is fair because there is relief available. As far as the application of firm resettlement, the factors that were adjudicated in this case clearly show that he was firmly resettled, as is defined, in terms of having an offer of residency. Whether or not there is... Suppose, it's sort of a corollary to the example you just got from Judge Kleinfeld, but suppose he was still there in 1984, and there was a revolution, and the Chinese just simply took over the country. What about that? Is he still firmly resettled? Well, he has a chance to rebut whether or not he's firmly resettled, and that is he can show whether or not his freedoms were so restricted that he was not firmly resettled, or he lived in a situation that could not be defined as firm resettlement, and he failed to rebut it in this case. So it isn't a per se, here's an identity card, you are firmly resettled finding. There is a chance to rebut that proposition before the immigration judge, and the other thing is that he can show... The other way to rebut is to show that he wasn't resettled, it was a temporary stop as he was fleeing persecution, but I guess the other manner, which I just mentioned, that showing that his freedoms were so restricted that he, in fact, was not resettled, would be the other way to go. So it is a rebuttable presumption. But your bottom line is that he failed to make his case for withholding of removal on the merits at the I.J. level, and he didn't appeal. Correct, Your Honor. And so he's out of court now. I guess one of the things that's pending in this case is a request for reconsideration with new counsel, new evidence, maybe. But I was going to ask his counsel about that request for reconsideration, what are the grounds for that. But your theory, as I understand it, is that he lost his case when he didn't appeal on the withholding of removal. That was one of the reasons, yes, Your Honor. He lost on the asylum because of the firm He had a remedy from being removed to Hong Kong on the asylum. I don't want to comment about how the strength of his case on asylum, but his he's struggling against a kind of a bureaucratic decision on firm resettlement. Now, I don't know whether the I.J. looked at those. We have cases. I found some old cases back in the 1960s and 70s that, without any discussion, said that people who were firmly resettled don't have a case for asylum. Now, the I.J. said pretty much the same thing in this case, but times and conditions had changed, and the I.J. didn't say anything about that. So we don't know what the BIA or the I.J. would have thought about the question we've been asking counsel here today, what about those people who left after 1984, but before 1997, and we don't have any case law defining what is a valid resettlement claim or an invalid resettlement claim. We don't. There just isn't any. This Court would be writing the first published opinion on that subject if we get into that in this case. What should we say? Well, Judge, I think that those factors were brought up to the immigration judge and the board because the turnover had actually taken place after the initiation of these proceedings in China. Hong Kong was under the purview of China already at that point. So those factors were brought before the immigration judge, and at that level, the manner in which he addressed the firm settlement issue, I think, was based strictly on the reading of the regulation and applied it as it was before him. And then, moreover, as to the protection that may have been accorded to him because of this scenario, he adjudicated that on the withholding. I think in terms of the merits or getting into the details of whether or not, of course, if there was any asylum issues outside of the firm resettlement, this Court did find that firm resettlement doesn't register as a bar in this case. The case, as the Court knows under Inez Ventura, should be sent back to the board to make a finding as to the merits of the asylum case. But again, Your Honor, I would stress that I think that a plain reading of the statute and the regulation needs to be considered, I'm sure it is, by the Court. And that's what the judge and the board utilized in deciding this case. The considerations that Your Honor just brought up presumably were considered by Congress or both branches of the other branches of government in the form of the regulation that promulgated and then thereafter the statute that was promulgated by Congress. And Congress came back to the board. That's hard to say, isn't it, when there's no development in the statute whatsoever with respect to the unique situation where one country is overtaken by another? Yes, Your Honor. Well, there is no mention, of course, of that specific scenario in the statute. As far as timing, though, there was specific consideration as to what period of time is important. As to why that period of time is important, I think the statute, I guess, is silent. But it is clear that it's prior to the arrival in the United States. And again, I would state, though, outside of that, there is other forms of relief for such individuals. On his withholding of deportation, the board said all he had to fear in China was, at most, discrimination, not persecution. Should we take that as a given? Is that established with finality? Well, as far as the, I believe, the immigration judge, let's see here. Yeah, it was the IJ decision. The IJ decision. That would be final, yes, because it was an appeal to the board. So that particular decision, December 13, 2000, not appealed, final. As to withholding of deportation. What I'm thinking is, we can use the fact in it, the established fact that he has no, it's not more likely than not that he will be persecuted if he returns to China. Is that correct? Well, I think that when the board reviews the decision of immigration judge DeNovo and issues its own independent decision, I think the court needs to review the decision of the board. In so doing, in its analysis. But this one wasn't reviewed. That particular finding was not reviewed by the board. May I ask a question? I don't think you understood my question. No, I'm not, Your Honor. I'm sorry. I didn't. Why don't you, if you don't understand it, tell me you don't understand it. I thought I did, but I guess I didn't. You're familiar with collateral estoppel in ordinary civil cases in court. Sometimes you can take a fact that's established in another case between the same parties that was not appealed and use that fact as established to help resolve the appeal of a case. I'm thinking that the unappealed I.J. decision establishes as a fact that it is not more probable than not that Wong will be persecuted even if he returns to communist China. Yes, I think. Is that true? Can you do that? Is there any law in it? Is there any reason why you can't do that? Well, as far as this attorney knows, what I would think is that it would be, I guess, the law of the case. And as far as this court's review of that finding, it was abandoned at the lower court. Could the court at this point use that finding of the immigration judge to support with the issue before the court now? I don't think it's really a matter before the court because the firmer settlement, I get the issue again. I'm a little wary of a decision that is going to keep the Falun Gong out because it may be that they have a lot more to fear than this fellow. This fellow, I don't see where as a practical matter he has anything to fear because his problem is that his family was struggled against in the Cultural Revolution. It's just not a problem anymore. But someone who's Falun Gong might have something to fear on account of the Communists taking over Hong Kong. So I'm a little wary of just going with the nice, neat, bureaucratic solution that if you were firmly resettled before the regime change, you're all done. Presumably, Your Honor, though the Falun Gong, if in fact such a situation exists where they have a problem in Hong Kong, that's something that they would bring up in the rebuttable presumption part of the firm resettlement. And presumably they could make the argument that I was not firmly resettled because my freedoms are restricted and therefore that bar does not apply. Except they were. Their freedoms weren't restricted. Right. Well, then you could go to any church you wanted in Hong Kong, long as it was a British colony. Well, I guess that would be a scenario for that court to determine whether or not the options for a petitioner or an alien in this country are clearly laid out. They bring up the withholding of, in this particular scenario, they didn't appeal the withholding. Counsel, I think we know your position. Your time has expired, long expired. Thank you. Thank you, Your Honor. Let's hear from Ms. Wong. Anything you wish to add? You have five minutes left. You don't have to use all the time, but is there anything you want to just mention by way of rebuttal or anything else you think we need to know? Well, on the issue of withholding, I'd like to point out that as a remedy, the withholding standard is, of course, higher than that for political asylum. Right. Also, the benefits of withholding are more limited in that you cannot bring in your family members who are outside the United States, so that withholding as an alternative to asylum is not, in all practicality, a real alternative. Right. And Your Honor mentioned that the statute is silent on the issue in this precise on this precise question. According to the text in Chevron, if the statute is silent, then we look to congressional intent. Or if congressional intent cannot be found, as I have not been able to come up with anything to indicate what Congress meant to do in this particular situation, then we go back to the principle of common sense, which is that just because someone goes to a third country prior to applying for asylum in the United States doesn't necessarily mean that it's safe for him to return there. All right. And that is the gist of our argument. All right. Thank you, counsel. Thank you, Your Honor. The case just argued will be submitted for decision. I take it we don't have counsel on the other two immigration cases, so we should now go to United States v. Sandoval Mendoza and Sandoval Mendoza.
judges: Goodwin, O'scannlain, Kleinfeld